# FOR PUBLICATION

FILED & ENTERED

APR 29 2015

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Fisher    DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re: | CHAPTER 7 |
| Owner Management Service, LLC<br>Trustee Corps | Case No.:  1:12-bk-10231-MT |
| | Adv No:   1:13-ap-01394-MT |
| Debtor(s). | |
| Bank of Ameirca, N.A. | **MEMORANDUM OF DECISION RE: MOTION FOR SUMMARY JUDGMENT** |
| Plaintiff(s), | |
| v. | |
| CD-04, Inc.,  Creative Group Resource, LLC, Dorothy Matsuba, Thomas Matsuba, Jamie Matsuba,  OMS Global, LLC, OMS, LLC,  OMS, LLC dba OMS Global LLC fka Ramsfire Global LLC,  Owner Management Service, LLC,  Ramsfire Equity Partners, Inc.,  Ramsfire Global, LLC,  Westside Servicing Company | |
| Defendant(s). | |

///

///

On January 9, 2012, debtor Owner Management Service, LLC; Trust Holding Service Co; Bill Pay Service and Boston Holding (collectively, the "Debtor") filed a voluntary chapter 11 petition. This adversary proceeding (the "Substantive Consolidation Complaint") is related to the Debtor's pending chapter 7 bankruptcy case and was commenced on December 18, 2013, by Bank of America N.A. ("Bank of America" or "Plaintiff"). A motion for preliminary injunction was filed on the same day seeking to enjoin Defendants and their employees from selling, transferring, wasting, encumbering or otherwise disposing of their assets, Real Properties, or Non-Debtor Real Properties among themselves or with any third party without express approval of this Court. The motion also requested that Defendants be ordered to disclose and produce a schedule of non-Debtor real property, a full accounting of all revenues for the period of 2006 to the date of the motion, and a schedule of all accounts held in their name at financial institutions. Along with the motion, Plaintiff filed a request for judicial notice containing 148 exhibits. On February 12, 2014, an order taking judicial notice of the exhibits and granting Plaintiff's application for preliminary injunction against defendants was entered.

Plaintiff then filed a motion for summary judgment (the "Motion") on September 30, 2014. Plaintiff Bank of America seeks to substantively consolidate Defendants OMS, LLC; OMS Global, LLC; Ramsfire Global, LLC; Ramsfire Equity Partners, Inc.; Westside Servicing Company; CD-04, Inc.; Creative Group Resource, LLC (collectively the "Entity Defendants"); Dorothy Matsuba ("Dorothy"), Thomas Matsuba ("Tom"), and Jamie Matsuba ("Jamie"), (collectively the "Individual Defendants"). The Entity Defendants and Individual Defendants are collectively referred to herein as the "Defendants." The hearing was initially set to be heard on December 16, 2014. On October 8, 2014, Defendants filed a motion to continue the hearing. The Court continued the hearing to January 23, 2015. On November 3, 2014, the Court entered an order granting Nationstar's motion to intervene. Nationstar subsequently filed a notice of joinder to Bank of America, N.A.'s motion for summary judgment.

Plaintiff alleges that Defendants' financial affairs and business dealings are so entangled with the Debtor that significant estate resources will be required to attempt to identify and distinguish estate property, if it is even possible. Defendants oppose the motion and argue that it does not establish (a) the time or expense required to trace the proceeds into and out of the Debtor's prepetition bank account(s) or (b) that such time or expense is so substantial or burdensome as to threaten the realization of any net assets for creditors.

I.    EVIDENTIARY OBJECTIONS

Before addressing the merits of the motion, the various evidentiary issues raised by the parties must be addressed.

### A. Motion to Strike Grobstein's Declarations

Defendants have filed the expert opinion of Howard B. Grobstein ("Grobstein") and assert that it creates a question of material fact on whether it will be time consuming or costly to trace the proceeds into and out of the Debtor's pre-petition bank accounts. Plaintiff filed a motion to strike the Grobstein Declaration because it will not assist the trier of fact as required under Federal Rule of Evidence 702 and it is insufficient to form the basis of an expert opinion under Federal Rule of Evidence 703. Plaintiff claims that Grobstein is only offering an opinion as to whether he thinks he can reconstruct the records and provide a tracing. Defendants' opposition to the motion to strike argues that the Grobstein Declaration goes directly to the

1
2

critical issue of whether "the time and expense necessary to even attempt to unscramble the affairs/transactions/assets is so substantial as to threaten the realization of any net assets for all of the creditors' or where no accurate identification and allocation of assets is possible."

3
4
5
6
7
8

Defendants filed the Grobstein Declaration on December 2, 2014 with their opposition to the motion for summary judgment and a supplemental declaration was subsequently filed, without leave from the court, on January 21, 2015 (two days before the hearing). The supplemental declaration is untimely as it was filed after Defendants' deadline to oppose the Motion. Local Rule 7056-1(c)(3) requires Defendants to submit all evidence by the opposition date. LBR 7056-1(c)(3) ("The respondent is responsible for filing with the court all necessary evidentiary documents cited in the response . . ."). The Defendants had ample notice and time, to assemble and offer their evidence in support of the Opposition, sixty three days specifically, three times the amount of time provided under the Local Rules. LBR 7056-1(c)(1).

9
10
11
12
13
14
15
16
17
18
19
20

According to the Grobstein Declaration, Defendants Dorothy and Jamie met with Grobstein on November 24, 2014. The Defendants provided Grobstein with "only minimal documentary information." See Grobstein Decl. ¶ 6:18-21. Grobstein appears to have been told that this was primarily because the FBI had seized and taken possession of the books and records of OMS Global. Jaime states in her declaration that the FBI seized records on August 6, 2014. That Defendants' records were fairly recently seized is no excuse for the lack of adequate and separate records for years prior to the seizure. The Substantive Consolidation Complaint was filed almost a year before the seizure of the records. On January 30, 2014, at the preliminary injunction hearing, the parties discussed the Ninth Circuit substantive consolidation factors. The purpose of the preliminary injunction was to try to sort out the different companies and determine whether the impression Defendants had been giving all along was accurate. Even prior to the complaint, Defendants were on notice about the allegation of improper commingling of properties and accounts. As early as March 7, 2012, Plaintiff raised this as the basis of its joinder to the U.S. Trustee's opposition to the Debtor's motion to dismiss. See Docket # 74 in bankruptcy case no. 12-10231. The U.S. Trustee also raised concerns over adequate disclosures of expenditures in the bank accounts for non-debtor entities in the early months of the bankruptcy case. The lack of documentary information has been a common theme throughout this case. Long before the seizure by the FBI, Debtor and Defendants have failed to provide anything more than minimal information despite repeated orders and opportunities.

21
22
23
24

Even if both the Grobstein and supplemental Declarations were considered, they do not raise a material disputed fact prohibiting summary judgment because the mere promise to produce admissible evidence at a later time is insufficient to defeat a motion for summary judgment. Garside v. Osco Drug, Inc., 895 F.2d 46 (1st Cir. 1990); see also, Crawford v. Lamantia, 34 F.3d 28 (1st Cir. 1994) (holding that neither conclusory allegations, improbable inferences, and unsupported speculation nor brash conjecture coupled with earnest hope that something concrete will materialize is sufficient to block summary judgment).

25
26

Grobstein's expert opinion is also not admissible because of its speculative and unsupported nature. Rule 702 of the Federal Rules of Evidence provides:

27
28

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the

evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

An expert's opinion can offer no assistance to the trier of fact and is inadmissible on relevance grounds, where the factual basis for the expert's opinion is fundamentally unsupported, either because the expert fully relied on altered facts and speculation, or because the expert failed to consider relevant facts in reaching a conclusion. In re Nellson Nutraceutical, Inc., 356 B.R. 364 (Bankr. D. Del. 2006); see also In re Evans, 492 B.R. 480 (Bankr. S.D. Miss. 2013) (A valuation of collateral that is unsupported by sufficient data is "unreliable" under rule governing admissibility of expert testimony); Aegis Ins. Services, Inc. v. 7 World Trade Co., L.P., 737 F.3d 166, 180 (2nd Cir. 2013) (Expert reports speculating how various design features of a high-rise building could have been modified to withstand a collapse were too speculative and conjectural to create triable issues of fact on a motion for summary judgment.)

Although both declarations are inadmissible under Rule 702, and the second one because of its tardiness, the Court has read and considered them because of the significance of substantive consolidation to Defendants. As discussed below, their consideration does not change the conclusion the Court must draw from the evidence.

### B. Judicial Notice

Plaintiff has submitted over two hundred exhibits in support of its Motion for Summary Judgment. Exhibits 1-147 were previously filed in conjunction with Plaintiff's Request for Judicial Notice in support of its application for preliminary injunction ("RJN"). Plaintiff asks the Court to additionally take Judicial Notice of Exhibits 148-206 filed concurrently with its motion. (Exhibit 206 contained unredacted bank records and was accepted under seal) (the "Second RJN").  Defendants argue that the Court cannot take judicial notice of any of the exhibits submitted by Plaintiff.

The Court may consider the records in this case, the underlying bankruptcy case and public records. See, e.g., The Golden Gate v. Marincovich, 286 F. 105, 106 (9th Cir. 1923) ("Every court takes judicial notice of its own records in the same case"); Hotel Employees & Rest. Employees Local 2 v. Vista Inn Mgmt. Co., 393 F. Supp. 2d 972, 978 (N.D. Cal. 2005) (taking judicial notice of publicly recorded documents such as grant deeds); Daniels Hall v. Nat'l Educ. Ass'n, 629 F.3d 992, 998-99 (9th Cir. 2010) (allowing judicial notice of publicly available information on state websites where neither party disputed the accuracy); In re Abbatiello, 484 B.R. 655, 658 (Bankr. M.D. Pa. 2013) ("A bankruptcy judge may take judicial notice of his or her own docket"); In re Martell, 349 B.R. 233, 234 n.1 (Bankr. D. Idaho 2005) ("[T]he Court takes judicial notice of its file in this matter."). The Court has already taken judicial notice of exhibits 1-147 in this case. See Order Granting Plaintiff's Application for preliminary injunction against defendants, doc. no. 33. At the time the RJN was filed, Defendants did not oppose the request. Defendants have waived their opportunity to object. The earlier hearing related to the scheduling of this summary judgment motion and included a discussion of how to include the RJN exhibits by reference here, so that counsel and the court would not receive duplicate masses of exhibits. All that has changed since the earlier hearing is that new counsel substituted in for Defendants.

In addition, judicial notice of Exhibits 148-206 attached to Plaintiff's Motion is appropriate pursuant to Federal Rule of Evidence 201 because the exhibits are either court documents or generally accessible to the public and the accuracy of the documents have not been questioned. Defendants have not provided any reason to doubt the authenticity of those exhibits. A majority of the exhibits include County Recorder records containing official stamps, Secretary of State Records, and depositions taken under penalty of perjury. The Court also has the discretion to take judicial notice of public records and its findings, orders, and records in this case and the related, underlying main bankruptcy proceeding.

Each individual exhibit's contents will be considered solely where it also would be admissible. Thus, the Court takes judicial notice of the authenticity of all the exhibits submitted and then will determine whether each category of evidence would be admissible at trial.

## C.  Defendants' Evidentiary Objections

Defendants generally argue that all the evidence is inadmissible as either hearsay, irrelevant, not the best evidence, lacks foundation and/or authenticity.  Well-settled Ninth Circuit precedent specifically deals with evidentiary objections at the summary judgment stage. In general, at the summary judgment stage, the Court does not focus on the admissibility of the evidence's form, but on the admissibility of its contents. Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003) ("Fraser") citing Block v. City of Los Angeles, 253 F.3d 410, 418–19 (9th Cir.2001) ("To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56."). Because the [evidence] could be presented in an admissible form at trial, we may consider the [evidence's] contents in the summary judgment motion. Fraser at 1037; accord Hughes v. United States, 953 F.2d 531, 543 (9th Cir.1992) (litigation adviser's affidavit may be considered on summary judgment despite hearsay and best evidence rule objections; the facts underlying the affidavit are of the type that would be admissible as evidence even though the affidavit itself might not be admissible); J.F. Feeser, Inc. v. Serv–A–Portion, Inc., 909 F.2d 1524, 1542 (3d Cir.1990) (hearsay evidence produced in an affidavit may be considered on summary judgment if the declarant could later present the evidence through direct testimony); Williams v. Borough of W. Chester, 891 F.2d 458, 465 n. 12 (3d Cir.1989) ("hearsay evidence produced in an affidavit opposing summary judgment may be considered if the out-of-court declarant could later present that evidence through direct testimony, i.e. in a form that would be admissible at trial.") (internal quotation marks omitted).

### 1.  County Recorder Records

Plaintiff has submitted numerous county recorded deeds of trust, grant deeds, assignments, notices of default and trustee's sale. All of these exhibits would be admissible at trial under Federal Rule of Evidence Rule 803(14) -- Records of Documents that Affect an Interest in Property. The record of a document that purports to establish or affect an interest in property constitutes a hearsay exception if (A) the record is admitted to prove the content of the original recorded document, along with its signing and its delivery by each person who purports to have signed it; (B) the record is kept in a public office; and (C) a statute authorizes recording documents of that kind in that office. This hearsay exception allows admission of a record of a title document to prove not only the contents of the document but also its due execution and delivery by each person by whom it purports to have been executed. § 7055 Rule 803(14):

Records of Documents that Affect an Interest in Property, 30C Fed. Prac. & Proc. Evid. § 7055 (2014 ed.).

## 2. Secretary of State Website Records

Defendants argue that the Secretary of State Business Entity Information was simply printed off the Internet, are not "public record" and are not documents filed by anybody with the Secretary of State. Defendants claim the truth of the matter set forth in this document are not established by judicial notice. See, Lustgraaf v. Behrens, 619 F.3d 867, 885 (8th Cir. 2010), U.S. v. Corinthian Colleges, 655 F.3d 984, 998-999 (9th Cir. 2011) and Pina v. Henderson, 752 F.2d 47, 50 (2d Cir. 1985).

The contents of the evidence would be admissible under Rule 803(8)(A)(i) which provides a hearsay exception for records or statements of public offices, which includes agencies, Rule 101(b)(3), dealing with official activities of the office or agency reasonably necessary for the performance of the duties of the office. The Secretary of State's office supports Businesses by registering and authenticating business entities and trademarks and enabling secured creditors to protect their financial interests. The Secretary of State Websites provide access to domestic stock, domestic nonprofit and qualified foreign corporations, limited liability company and limited partnership information of record with the Secretary of State.

When public records are presumed authentic and trustworthy, the burden of establishing a basis for exclusion falls on the opponent of the evidence. Johnson v. City of Pleasanton, 982 F.2d 350, 352-53 (9th Cir. 1992), citing Keith v. Volpe, 858 F.2d 467, 481 (9th Cir.1988). Defendants offered no evidence on the unreliability of the information from the Secretary of State website. The websites contain disclaimers but this does not show that the information is not reliable, correct or incomplete in that the Court understands these records to be the information submitted by the entities or individuals indicated on the records and not an independent investigation by the Secretary of State. Thus, the business entity search records produced by the Secretary of State Websites would be admissible at trial because the business information was compiled by a public office necessary for the performance of the duties for that office. In addition, if necessary, Plaintiff could obtain certified copies of the records.

## 3. Sworn Statements

Plaintiff has submitted sworn statements, affidavits, and declarations of the Debtor, Defendants and their officers, and the trustee and his professionals that were given in either discovery responses, previous pleadings, or as testimony from state court proceedings involving Debtor and some Defendants. Defendants object to all of these statements based on hearsay, no authentication and lack of foundation.

Foundation is established when a declarant states facts sufficient to establish the basis for his or her personal knowledge. In re McAllister, No. 1:12-BK-20052-AA, 2014 WL 3955008 (B.A.P. 9th Cir. Aug. 13, 2014) at *12.4. All of the testimonial documents were submitted to the Court in full, with the supporting testimony to establish the declarant's personal knowledge. The Declarations relied upon by the Court appear to be made on personal knowledge, set out facts that would be admissible at trial, and show that the declarant is competent to testify to the matters stated therein. See Fed.R.Civ.P. 56(c)(4).

Deposition testimony, irrespective of its contents, is ordinarily hearsay when submitted at trial or a motion hearing involving live witness testimony, but not when submitted on a summary judgment motion. Orr v. Bank of Am., NT & SA, 285 F.3d 764 (9th Cir. 2002). It is also not hearsay when statements by a party are introduced for the purpose that they were made and not for the truth of the matter asserted. See, e.g., United States v. Whitman, 771 F.2d 1348, 1352 (9th Cir. 1985) (no hearsay problem because statements were introduced for the purpose that they were made, not for the truth of the matter asserted); United States v. Gadson, 763 F.3d 1189, 1212 (9th Cir. 2014) (same). Out of court statements are regularly introduced, and are not hearsay, as circumstantial evidence to show the declarant's state of mind. United States v. Brown, 562 F.2d 1144, 1148 (9th Cir. 1977) (defendant's request that witness "[not] hurt him" was non-hearsay; admissible to show defendant's state of mind).

The majority of Plaintiff's evidence is submitted not for the truth of the matter asserted, but simply for the proposition that Defendants or Debtor's principals made such statements, often times to the Court and under penalty of perjury. For the statements to be admissible at trial, Plaintiff would subpoena all of the individuals who previously provided declarations or testimony as trial witnesses to testify regarding their prior declarations and statements. If, however, the declarants were not available, testimony would come in as former testimony of an unavailable party under Federal Rule of Evidence (FRE) 804(b)(1). Defendants' statements would also be admitted as not hearsay under Fed. R. Evid. 801(d)(2)(A) through (E) as an admission by party opponent. Defendants argue that the statements admitted as a party admission cannot be used against the other Defendants. The statements made by one of Defendants can be used not only against that speaking party, but also against all other Defendants, because such would be the case with admissible testimony by one party as to the others at trial, as long as Defendants are available to be cross-examined. Plaintiff has made the necessary showing that all Defendants were working in concert as part of one conspiracy so that all statements of Defendants and Debtor also come in under Fed. R. Evid. 802(d)(2)(E). See, e.g., Fraser, 342 F.3d at 1036-37; In re McAllister, 2014 WL 3955008, at *12 and FRE 801(d)(2)(E) (Admissions; Statements by Coconspirator).

### 4. Documents Submitted In Debtor's Bankruptcy

Plaintiff has also submitted Debtor's Bankruptcy petition, records, schedules, monthly operating reports, bank records and pleadings. "Statements in bankruptcy schedules are executed under penalty of perjury and when offered against a debtor are eligible for treatment as judicial admissions." In re Bohrer, 266 B.R. 200, 201 (Bankr. N.D. Cal. 2001); see also In re Haun, 396 B.R. 522, 530 n.16 (Bankr. D. Idaho 2008) ("The submissions in [the underlying bankruptcy case] made by Defendant under penalty of perjury, such as in his sworn schedules and statement of financial affairs, may be treated as evidentiary admissions under Fed. R. Evid. 801(d).") "A debtor may not adopt a cavalier attitude toward [ ] the accuracy of his schedules by arguing that they are not precise and correct." Id. In re Acequia, Inc., 787 F.2d 1352 (9th Cir.1986), recognizes that a bankruptcy judge may consider evidence from a prior hearing in the same case if the notice of what will be considered is sufficient to permit the parties to challenge the prior evidence.

In this case, Defendants had notice and did in fact challenge the evidence from prior hearings in both the Bankruptcy and Adversary Proceeding. Debtor's underlying bankruptcy petition, schedules, and monthly operating reports, are important in showing the various statements and admissions made by the Debtor in the underlying bankruptcy case. Finally,

because the documents Debtor filed in its bankruptcy were executed under penalty of perjury, the Court should be able to rely on their contents if no specific evidence is produced to conflict with them.

The Court finds Plaintiff's evidence is relevant [1], consists largely of admissions made by Defendants themselves or unrebutted testimony by the Trustee and the Trustee's professionals, and is ultimately what could be presented in an admissible form at trial. As discussed below, Plaintiff has met its burden to show that the evidence satisfies Federal Rule of Civil Procedure 56 and each category of evidence also would be admissible at trial. Defendants' objections are overruled.

II.    CONTROLLING LAW

Defendants argue pursuant to Stern v. Marshall, 131 S.Ct. 2594 (2011) ("Stern") and its progeny, the Bankruptcy Court does not have jurisdiction to enter a final judgment on the Complaint or the relief requested by the Motion. Defendants also maintain there is no legal basis for substantive consolidation under the Bankruptcy Code, arguing that according to Law v. Siegel, 134 S. Ct. 1188 (2014) ("Siegel") and other Supreme Court precedent, section 105 of the Bankruptcy Code is not a source of substantive law.

## A.    Stern v. Marshall Objection

The authority of bankruptcy judges generally depends upon whether the matter constitutes a core or non-core proceeding. See 28 U.S.C. § 157. Bankruptcy courts may issue final judgments and orders in core proceedings, but in non-core proceedings, may only submit proposed findings of fact and conclusions of law to a district court for final judgment. See 28 U.S.C. §§ 157(b)(1), (c)(1). Stern held that, although Congress defined creditors' counterclaims against the bankruptcy estate as core, the bankruptcy court nonetheless "lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." Id. Stern did not hold that a bankruptcy judge lacks authority to enter judgment regarding what property is included in the estate. Olivie Dev. Group LLC v. Ki Chang Park, 2012 U.S. Dist. LEXIS 60299, 13 (W.D. Wash. Apr. 30, 2012).

Substantive consolidation was not affected by Stern and remains a core preceding that can be adjudicated by a bankruptcy judge.  As the Ninth Circuit Bankruptcy Appellate Panel; explained in LLS America:

> Substantive consolidation does not exist outside the context of a bankruptcy proceeding. It is only available in a bankruptcy proceeding commenced under the federal bankruptcy scheme. Although not expressly provided for in the Bankruptcy Code, it has been a tool utilized by bankruptcy courts since the Bankruptcy Act of 1898. Clearly substantive consolidation is a core matter as it "arises under" Title 11 or "arises in" a

---

[1] The fact that a statement may be irrelevant has no bearing upon a motion for summary judgment. A bankruptcy court can award summary judgment only when there exists no genuine dispute of material fact. It cannot rely on irrelevant facts; thus, relevance objections are redundant. In re McAllister, No. 1:12-BK-20052-AA, 2014 WL 3955008, at *12 (B.A.P. 9th Cir. Aug. 13, 2014) citing Burch v. Regents of the Univ. of Cal., 433 F.Supp.2d 1110, 1119 (E.D.Cal.2006).

case under Title 11. . . . The narrow holding of <u>Stern v. Marshall</u> does not apply to the Motion for Substantive Consolidation.

2011 Bankr. LEXIS 3429 (Bankr. E.D. Wash. Sept. 8, 2011) aff'd <u>In re LLS Am., LLC</u>, No. BAP EW-11-1524-DHPA, 2012 WL 2042503 (B.A.P. 9th Cir. June 5, 2012).[2] See also <u>In re Petters Co., Inc.</u>, 506 B.R. 784 (Bankr. D. Minn. 2013) <u>motion to certify appeal denied sub nom.</u> <u>WestLB AG v. Kelley</u>, 514 B.R. 287 (D. Minn. 2014) (Substantive consolidation is uniquely a matter of bankruptcy law, and its application is limited to bankruptcy cases).

## B. Law v. Siegel Objection

Defendants claim that <u>Law v. Siegel</u>, held that the Bankruptcy Court has no inherent powers or authority pursuant to 11 U.S.C. § 105 to enact substantive federal common law where the Bankruptcy Code does not specifically permit the requested relief. Defendants argue that there is no specific or general provision in the Bankruptcy Code or Federal Rules of Bankruptcy that authorizes substantive consolidation, thus, there is no legal basis to order substantive consolidation of non-debtors, particularly individuals, under section 105 of the Bankruptcy Code. (See Opp. at 3-4, 21-22 citing <u>Norwest Bank Worthington v. Ahlers</u>, 108 S.Ct. 963, 968 (1988), <u>Butner v. United States</u>, 99 S.Ct. 914, 918 (1979); <u>In re Ludlow Hospital Society, Inc.</u>, 124 F.3d 22, 28 (1st Cir. 1997) and <u>Official Unsecured Creditors' Comm. v. Stern</u>, 984 F.2d 1305, 1311 (1st Cir. 1993).

Debtor has expanded the holding in <u>Siegel</u> without basis. In <u>Siegel</u>, the Supreme Court solely ruled that although a bankruptcy court has statutory authority to issue any order necessary to carry out the provisions of the Bankruptcy Code under 11 U.S.C.S. § 105(a), "in exercising those statutory and inherent powers, a bankruptcy court may not contravene specific statutory provisions" 134 S.Ct. 1188, 1190 (2014).[3] In addition, Defendants misinterpret Supreme Court precedent and the applicable Ninth Circuit substantive consolidation test. The Ninth Circuit's decision in <u>In re Bonham</u>, 229 F.3d 750 (9th Cir. 2000), was rendered after <u>Norwest</u> and after each of the other First Circuit decisions Defendants cited. The primary purpose of substantive consolidation is to ensure the equitable treatment of all creditors. <u>Id.</u> The court is not creating or modifying substantive rights and is not contravening any specific statutory provision. Substantive consolidation is a long standing equitable remedy that is available under particular circumstances in bankruptcy cases.[4]

---

[2] In <u>Executive Benefits Ins. Agency v. Arkison</u>, 134 S. Ct. 2165, 189 L. Ed. 2d 83 (2014) ("<u>Bellingham</u>"), the Supreme Court ruled that jurisdiction over a core "<u>Stern</u>" matter is proper under the Constitution if the core matter is treated as a non-core matter under 28 U.S.C § 157(c). Where the Bankruptcy Court may not have authority to enter a final judgment in core matters to which a party does not give consent, the Bankruptcy Court is still directed to consider core claims and make findings of fact and conclusions of law and a recommendation to the District Court. (<u>Bellingham</u>, 134 at 2172-73.) If defendants should prevail in their theory that this court does not have authority to hear this matter, this ruling is hereby deemed a report and recommendation to the district court. The findings of fact and conclusions of law herein may be considered by the district court under § 157(c)(1).

[3] The Supreme Court held that [t]he broad authority of the bankruptcy court to carry out the provisions of the Bankruptcy Code and inherent power to sanction abusive litigation practices did not extend to surcharging the exemption, since the surcharge contravened the specific prohibition under 11 U.S.C.S. § 522(k) that the exemption was not liable for payment of the attorney fees as an administrative expense.

[4] Substantive consolidation is premised upon the goal of a ratable fair distribution to creditors, which is one of the fundamental goals and purposes of the federal bankruptcy scheme. It is not a matter of state law and does not arise under state law. <u>In re LLS Am., LLC</u>, 2011 Bankr. LEXIS 3429, 1 (Bankr. E.D. Wash. Sept. 8, 2011).

Defendants argue although the Supreme Court has not ruled on this issue, the Court can infer from its recent decisions discussing section 105 that the Supreme Court would rule against substantive consolidation. Defendants cite no law to support its argument that this Court can read broad new rules into Supreme Court rulings in order to specifically ignore Ninth Circuit precedent. The Ninth Circuit Court of Appeals expressly adopted the Second Circuit's test for substantive consolidation set forth in Augie/Restivo. Bonham, 229 F.3d 750, 766 (9th Cir. 2000), citing Union Savings Bank v. Augie/Restivo Baking Co. Ltd. (In re Augie/Restivo Baking Co.), 860 F.2d 515, 518 (2d Cir. 1988). (Thus, even though substantive consolidation was not codified in the statutory overhaul of bankruptcy law in 1978, the equitable power undoubtedly survived enactment of the Bankruptcy Code. No case has held to the contrary). The Ninth Circuit has also more recently specifically held that bankruptcy courts may order substantive consolidation. See In re Meruelo Maddux Properties, Inc., 667 F.3d 1072, 1075 (9th Cir. 2012); United States v. Hoyt, 47 Fed. Appx. 834, 837-38 (9th Cir. 2002). Substantive consolidation is an independent equitable remedy that the bankruptcy court may impose under appropriate circumstances.

## C. **Substantive Consolidation**

Bankruptcy courts within the Ninth Circuit have authority to order substantive consolidation of a debtor with non-debtor entities *nunc pro tunc* to the petition date pursuant to section 105 of the Bankruptcy Code. In re Bonham, at 758, 764. The Ninth Circuit adopted the Second Circuit's Augie/Restivo test for determining whether substantive consolidation is proper. The test requires consideration of two factors, the presence of either of which is sufficient basis to order substantive consolidation: (1) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit, or (2) whether the affairs of the debtor are so entangled that consolidation will benefit all creditors. Id. Under the second factor, entanglement of the debtor's affairs is a basis for consolidation only where the time and expense necessary even to attempt to unscramble them is so substantial as to threaten the realization of any net assets for all the creditors, or where no accurate identification and allocation of assets is possible. Id. Entanglement of the debtors' affairs involves cases in which there has been a commingling of two firms' assets and business functions. In re Augie/Restivo Baking Co., Ltd., 860 F.2d 515, 519 (2d Cir. 1988). The summary judgment motion focuses upon the second of the two Bonham tests: the entanglement of the Debtor's affairs and whether accurate identification and allocation of assets is possible. In ordering substantive consolidation, bankruptcy courts must (1) consider whether there is a disregard of corporate formalities and commingling of assets by various entities, and (2) balance the benefits that substantive consolidation would bring against the harms that it would cause. In re Bonham, 229 F.3d 750 (9th Cir. 2000).

## D. **More Due Process Than Involuntary Proceeding**

Defendants argue that substantive consolidation is similar to an involuntary bankruptcy filing and directly conflicts with the congressional mandate of section 303 of the Bankruptcy Code. This case however, is not an involuntary filing and the filing of an adversary proceeding ensures procedural safeguards to each Defendant in this case that go above the requirements of an involuntary bankruptcy petition. Defendants have had ample opportunity to provide evidence to defeat this substantive consolidation motion, and great efforts have been taken for three years to ensure their due process rights, often to the detriment of the Trustee's estate administration. Many of Defendants' theories were previously tested not only in motions in Debtor's bankruptcy case, but in an appeal to the U.S. District Court of the order

appointing a trustee. See Order Affirming Bankruptcy Court Decisions Converting Case to Chapter 7 and Denying Reconsideration and Denying Motion to Strike as Moot, September 21, 2012, ECF No. 728. Defendants had a duty to respond by the opposition date, which was much longer than required by the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules. Defendants were given ample time and opportunity and failed to meet their burden of raising material disputed facts to counter Plaintiff's evidence.

### E.  Summary Judgment

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  FRCP 56(c) (incorporated by FRBP 7056).

The moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts that show a genuine issue for trial. Id. at 324.  As for the burden of the responding party to raise issues in dispute, the evidence must be "significantly probative" and not merely "colorable." First California v. Pegler, Adv. Case No. 9:12-ap-01286-PC (C.D. Cal. September 24, 2014) citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The court must view the evidence in the light most favorable to the nonmoving party.  Bell v. Cameron Meadows Land Co., 669 F.2d 1278, 1284 (9th Cir.1982).  All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party.  Hector v. Wiens, 533 F.2d 429, 432 (9th Cir.1976).  The inference drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.  Valadingham v. Bojorquez, 866 F.2d 1135, 1137 (9th Cir.1989).  Where different ultimate inferences may be drawn, summary judgment is inappropriate.  Sankovich v. Insurance Co. of N. Am., 638 F.2d 136, 140 (9th Cir.1981). A "material fact" is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. The materiality of a fact is thus determined by the substantive law governing the claim or defense. T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n., 809 F.2d 626, 630 (9th Cir. 1987). The dispute about a material fact is "genuine," … if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). Conclusory and speculative declaration testimony that fails to set forth specific facts is insufficient to raise genuine issues of material fact. See Thornhill Publishing Co., Inc. v. General Telephone & Electronics Corp., 594 F.2d 730, 738 (9th Cir.1979).

Plaintiff's statement of uncontroverted facts ("SUF") lists the corresponding evidence for each defendant. Defendants were specifically required to point out the facts that are in dispute. Defendants failed to dispute or object to the accuracy and validity of the contents of Plaintiff's evidence. Other than evidentiary objections, Defendants did not refute specific facts. Defendants have submitted declarations in opposition to the motion that can only be read as supplementing the evidence submitted by Plaintiffs.  As Defendants' opposition offers no evidence to question the veracity of the facts contained in the proposed SUF or the other facts proffered by Plaintiff, such facts are deemed uncontroverted. See Fed.R.Civ.P. 56(c)(1); Fed.R.Civ.P. 56(e)(2). Thus, the Court adopts Plaintiff's statement of undisputed facts. See Order adopting Plaintiff's SUF entered concurrently with this memorandum of decision.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Defendants ask the Court to draw different conclusions in their declarations. Defendants' Declarations have been considered and any material inferences made in their favor in reaching the conclusions discussed below. Although Plaintiff disputes the factual assertions in Defendants declarations, they are accepted as true for purposes of this summary judgment motion.  The following discussion is to highlight and explain how the undisputed facts from all parties form the Court's conclusions, but not all of the proffered facts from the parties will be repeated. Citations will not be provided as citations to all exhibits are contained in Plaintiff's SUF.

III.    DISCUSSION

This case presents no genuine issues of material fact and satisfies all the requirements under the <u>Bonham</u> test for substantive consolidation.  The entanglement of the Debtor's and Defendants' finances, records and assets are described below.  In addition to the cost and effort it would take to unscramble them, the only reasonable conclusion that can be drawn is that the entanglement was intentional and part of what made Defendants so successful in evading foreclosure of the properties for long enough to profit from the equity and rent skimming that formed the core of their investment scheme.

### A. Entanglement Among Debtor and Defendants of Real Estate Investments was the Business Model

The individuals and entities state that they are involved in the business of "investing in real estate," although they have not explained in any detail how the investments work or what the function was of so many different business names.  Based on a review of the hundreds of exhibits and transcripts and the long history of this case, Defendants' shared business model was to: (a) obtain control over homes from distressed borrowers and interject itself in the communication channels with Plaintiff and other lenders and servicers; (b) collect rents from homes without servicing the secured debt; (c) litigate with non-insider lenders to stall foreclosure, and (d) eventually abandon the real properties when they were no longer of any use or not generating rental income. The undisputed record shows that there were hundreds of transfers of real property starting as early as 2003 among Debtor and Defendants to strip available equity from the properties through loans from non-insider lenders. The evidence shows that the majority of these transactions involved transfers of title or purported "loans" between and among the Defendants. The public records provided show that Deeds of Trust were recorded in favor of Boston Holding Company (the Debtor), Westside Servicing Company, or Ramsfire Global LLC (OMS Global LLC). Deeds of Trust were also recorded in favor of traditional lending institutions (like Washington Mutual), but only after one of the Individual Defendants received a transfer of title. Once the Individual Defendant obtained title, he or she invariably obtained a loan (or two) from traditional lenders, and then transferred title back to an Entity Defendant, like Creative Group Resource, or to a newly formed purported single purpose "trust" controlled by Defendants.

It was also not disputed that a part of Debtor's business model was to sue lenders and servicers to prevent the foreclosure from going forward. No evidence or argument has been presented in either this adversary proceeding or the bankruptcy case that any of these lawsuits were found to be meritorious.  The evidence is solely that they caused extreme delays in the foreclosure process, during which Defendants and Debtor could collect rent from the properties

they controlled. Defendants themselves state that their real estate acquisition method is to obtain title from distressed homeowners through a transfer to one of their entities in trust. The properties are acquired by a trust and various dba's and names of Defendants are then substituted as "successor trustees" as necessary to delay foreclosures. The Debtor, through its counsel, Ronald Tym, described this in the Debtor's Emergency Motion to Reconvert to Chapter 11. See Dkt. no. 122 of bankruptcy docket, filed April 13, 2012, attached as Plaintiff's Exhibit 147 in this adversary action. He argues that the "business model involves receipt of equitable title to single family homes in return for a promise to use its best efforts to negotiate a short sale." That motion and other pleadings claim that they will often pay off the senior notes on the property, but no evidence has been submitted that either the Debtor or any Defendants have done this. There has also been no evidence of any negotiation or contact with the lender concerning a short sale. The only evidence of contacts with the lender has been unsuccessful litigation asserting various unfair business practices, faxes on the eve of foreclosure to indicate another transfer of the property or a bankruptcy filing.

One such pleading illustrating this business model is included as Plaintiff's Exhibit 145 which attaches a complaint brought by "OMS Global, as Successor Trustee" against Ocwen Loan Servicing in the California Superior Court. The complaint alleges that OMS Global LLC is the successor trustee for nine express *inter vivos* trusts through a written trust agreement. Each trust is the "titled owner of a home financed by Ocwen," and the home has been transferred by grant deed from the Ocwen borrower. Plaintiff's Exhibit 158 provides a full copy of one of these Trust Agreements where the homeowner has signed away any and all rights and the Trust has rights to do anything at all with the property, supposedly because it will help the defaulting homeowner in addressing the fact that the property is worth less than what is owed to the first trust deed holder.

The evidence is also clear that this entangled operation has been filing abusive bankruptcies as part of its "investment" strategy for many years. On May 31, 2011, one of Defendants, Ramsfire Equity Partners, Inc. ("Ramsfire") filed bankruptcy in this Court. See Case no. 11-16710. Although a junior lien interest was listed for only three properties, two additional senior secured lenders filed relief from stay motions for properties not scheduled. Their declarations that Ramsfire had taken a transfer of the deed of trust and was asserting its interest to stop a foreclosure sale were never contradicted. The secured creditor for one of the real properties scheduled by Ramsfire as a "junior lien" interest filed evidence that the non-English speaking original borrower believed he had simply signed documents allowing Dorothy to arrange a short sale for him. He moved out of the property, and Ramsfire or Dorothy rented it out instead and pursued varied tactics in California Superior Court to delay foreclosure before filing the bankruptcy case. Ramsfire did not contradict any of these factual assertions and moved to dismiss the case. The case was eventually dismissed after no one showed up for numerous rescheduled meetings of creditors. The trust agreement in Exhibit 158 referenced above, is in fact the property at 15381 Cottonwood, Huntington Beach, CA that Ramsfire Global sought to protect from foreclosure in its 2011 bankruptcy filing. Shortly after the homeowners deeded the property to "Trust Holding Service" (Debtor's dba), it was transferred to Ramsfire Global, LLC. That transfer document was then recorded and faxed to the foreclosure trustee with a notation containing the Ramsfire bankruptcy case number. This property was never listed as an asset in Ramsfire's schedules, although it was conveniently used to delay a foreclosure. See Relief from stay motion, Dkt. no. 35, filed August 9, 2011 in Ramsfire Global, case no. 11-16710.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

On May 29, 2012, following a hearing in the Debtor's bankruptcy case, the Court made a finding that the Debtor's current business model was a continuation of the same business model from a 2007 bankruptcy case wherein the Debtor and Debtor's insiders filed 30 or so involuntary cases. In 2007, several "involuntary petitions filed by the various Matsuba entities and affiliates" were dismissed based on bad faith. See In re Mi La Sul, 380 B.R. 546 (Bankr. C.D. Cal. 2007). In In re Mi La Sul, the court's finding of bad faith was based on a collusive filing between the petitioning creditors and the alleged debtor designed solely to provide the alleged debtor additional time to negotiate with the secured lender to conduct a short sale of real property. Id.

After hearings held by all three Bankruptcy Judges in the San Fernando Valley Division, the three judges assigned to the 30 different cases held that all the involuntary bankruptcy petitions were filed in bad faith where they were filed with prior consent of alleged debtors solely for the purpose of triggering the automatic stay and halting mortgage foreclosure sales, so as to provide petitioning creditor, which had provided financing to debtors whose fully encumbered property was on verge of being foreclosed, an opportunity to create equity in the property by negotiating a "short sale" of the mortgaged property with foreclosing lender. The findings in the Courts' memorandum were based on the representations made by attorneys for Trust Holding Service Co. and Boston Holding (dba's of the Debtor), the testimony of Daniel Powers, a review of the filings themselves and of any motions for relief from stay filed in those cases.

On October 29, 2012, Trustee Seror filed a first amended adversary complaint against Defendants OMS, LLC, Ramsfire Equity Partners, Inc., Westside Servicing Company, and CD-04, Inc. alleging that pre-petition, Defendants and Debtor engaged in a specific course of conduct and scheme to defraud and deprive homeowners of their property. See Case no. 12-01382. Throughout this case, the Trustee has filed over 30 adversaries against various parties, including some of Defendants.

## B. **The Defendants' Roles**

As Defendants have moved functions loosely among the Debtor and variations of the "OMS" name and other "trusts," the Court has endeavored to clarify how and when each entity was formed and what the corporate and individual's roles were. This has been difficult where the individuals and officers who know best what they were doing have not provided any explanation. Despite repeated opportunities to explain what these functions are and why the Debtor's assets are transferred to and from these different entities, no explanation has ever been provided other than they are all involved in "real estate investments" and that they all used one account from which to pay bills. Where Defendants have provided no explanation and no real dispute about what they were doing, the only conclusion that can be drawn is the one the Plaintiff's evidence supports – that the constantly shifting title, assets and commingled funds were central to the operation.  The inability of homeowners, lenders, foreclosure trustees and courts to understand who did what and who had title was central to continuing to control hundreds of properties and any income derived from control of the property.

### 1.  The Matsuba Family

Members of the Matsuba Family have controlled the Debtor and Defendant Entities since their formation. Ryu Goeku ("Goeku") is the Debtor's principal. Dorothy, also known as

Mayumi Matsuba and Yun Matsuba, is married to Tom, and they are Goeku's aunt and uncle. Jamie and Jane Matsuba, also known as Jane Garcia or Jane Park ("Jane"), are Dorothy's daughters. Tom is Jamie's father. Masae Matsuba, who is also known as Masae Ishida, is Tom's mother and Goeku's grandmother ("Masae") (collectively, the "Matsuba Family").

### 2. Dorothy Matsuba

Goeku testified that Dorothy was "the boss" and he provided her with a weekly report for the business. Dorothy signed checks on Debtor's behalf and had the ultimate say on payments made by the Debtor. She had a working understanding of how money would come in and out of the Debtor's accounts. The Debtor made a $1,008.36 payment for Mayumi Matsuba (one of Dorothy's aliases) and paid Dorothy's real estate license dues post-petition. Dorothy's control of the Debtor is a big part of why the Trustee has not been able to effectively marshal records and assets. Debtor's inability to turn over estate property to the Trustee was attributed to Dorothy, and OMS, LLC's control over the Debtor's books and records and made it impossible to get any full understanding of the Debtor's affairs.  Dorothy also controlled all mail coming in to the Debtor and the other entities.

### 3. Tom Matsuba

Tom has been the officer of OMS, LLC, Ramsfire Global, LLC and Westside Servicing Company since 2003. Debtor's monthly operating report ("MOR") showed that its bank accounts were used to pay Tom's personal expenses including payments made for his personal credit cards, Porsche and Mercedes automobiles. Tom, however, has testified that he never received any money from the Debtor.  Tom also controlled the post office boxes used by the Debtor and other Defendants and, along with Dorothy, refused the Trustee access to the Debtor's records.

### 4. Jamie Matsuba

Jamie is an officer of OMS, LLC and Ramsfire Global, LLC and Ramsfire Equity Partners, Inc. since 2003. Jamie was pivotal in changing the names of various entities and transferring properties into new names following Debtor's bankruptcy in order to maintain control of properties that the Trustee could assert were part of the estate.  She has commenced litigation post-petition over properties identified as the Debtor's.  Jamie also signed the earlier bankruptcy petition for Ramsfire Equity Partners, Inc., a previous bankruptcy case used to stop foreclosure activity on some of the properties controlled by this group.  The Debtor was paying Jamie's salary for the 90 days preceding the Debtor's bankruptcy filing, and has been listed as a previous officer of the Debtor in one of its earlier SOFA's.  Goeku has testified that he regularly consulted Jamie for advice on what to do.

### 5. Westside Servicing Co

In October 2003, Tom registered Westside Servicing Company as a Nevada corporation acting as its only officer. The public records show that Westside Servicing Company made regular loans to one or more of Defendants secured by real properties controlled by Defendants. Westside Servicing filed a proof of claim in Debtor's bankruptcy in the amount of $5,145,000 and was involved in the property transfers as described below.

### 6.  OMS LLC And Ramsfire Global LLC

On December 23, 2003, Tom and Jamie together registered OMS, LLC and Ramsfire Global, LLC. OMS, LLC in previously filed documents has been referred to as Ramsfire Global, LLC. On January 30, 2012, 21 days after Debtor Owner Management Service, LLC filed bankruptcy, Jamie amended Ramsfire Global, LLC's Articles of Organization to change its name to OMS, LLC. On March 9, 2012, OMS, LLC filed an application to register as a foreign corporation in order to use OMS Global, LLC as its name in California. Ramsfire Global is one of the "investors" who contributed funds monthly to support the Debtor's general operations including making payroll and funding litigation expenses. See Goeku's Testimony below.

### 7.  Ramsfire Equity Partners, Inc.

On December 23, 2003, Jamie registered Ramsfire Equity Partners, Inc. in Nevada. Ramsfire Equity Partners, Inc. formerly served as a member of OMS, LLC. In May 2011, Ramsfire Equity Partners, Inc. filed a petition for Chapter 7 bankruptcy relief before this Court, signed by Jamie and Ronald Tym as counsel. The only creditor disclosed was Wholesale Auto Trim, Inc., a California corporation. Jane (Dorothy's daughter and Jaime's sister) was the agent for service of process for Wholesale Auto Trim. As described earlier, the 2011 bankruptcy was used to delay foreclosure on at least five properties where there were various transfers and "junior liens".

OMS, LLC and Ramsfire Global, LLC. Ramsfire Equity Partners, and Westside Servicing Company are registered with the same addresses at 101 Convention Center Drive, Suite 700, Las Vegas, Nevada 89109 and P.O. Box 27740 Las Vegas, Nevada, 8912613 (the "Las Vegas Addresses"). Tom and Jamie have controlled these overlapping entities since 2003.

### 8.  CD-04, Inc.

In April 2004, Masae (Goeku's grandmother) registered CD-04 in Nevada. CD-04 holds junior liens on real properties held in trust.  It has filed proofs of claim in Debtor's case based on these transfers.

### 9.  Owner Management Service, LLC.

In May 2008, Tom and Jamie registered Owner Management Service, LLC in Nevada using the same Las Vegas Addresses as Westside Servicing, OMS, LLC, Ramsfire Global, LLC and Ramsfire Equity Partners, Inc.  In July 2009, Owner Management Service, LLC was registered this time in California with the same Las Vegas Addresses. Owner Management Services, LLC also did business as Boston Holding Company, Trust Holding Service Co., and Bill Pay Service.

### 10. Boston Holding Co.

In October 2008, Boston Holding Company was registered in California as a fictitious name of Owner Management Services, LLC. In the Fictitious Business Name Statement application, it states that registrant commenced transacting business under the fictitious business name listed above in May 2004. See RJN Ex. 14.  The Debtor claims it would use the name

Boston Holding when it was loaning money to other entities. According to the Debtor's Amended Schedule D, as Boston Holding, it loaned almost $1.4 million secured by trust deeds in second, third and fourth position on seven properties. Plaintiff claims that although the investigation is still on-going, the documents show that Boston Holding Company only loaned money to one or more of the Entity Defendants, like Creative Group Resource, one or more of the Individual Defendants, or to "trusts" controlled by Defendants. The notes and other supporting accounting or financial materials concerning these purported loans have not been located and were not produced by Defendants.

### 11. OMS Global, LLC

Two months after the Debtor's bankruptcy filing, OMS, LLC filed an application to register a foreign corporation in order to use OMS Global, LLC as its name in California. OMS Global claims that it is the Debtor's successor trustee for numerous alleged real property trusts with consumer borrowers. On July 24, 2012, attorney Ronald Tym filed a proof of claim for $10,993,000.00 on behalf of OMS Global, LLC based on promissory notes for money lent to the Debtor at 15% interest, secured by various real properties pursuant to short form deeds of trust and assignments of rent with secured positions through "Estimated Value of First Lien on Rent." OMS Global is controlled by Dorothy and Jamie. Ryu Goeku, the Debtor's principal, worked for OMS Global and was terminated in Fall 2013.

### 12. Creative Group Resource, LLC

Debtor's first MOR included unexplained transfers from the Debtor's bank account to Creative Group Resource, LLC ("CGR"). CGR was described as having three departments – property management, short sale and legal. CGR was an "investment company" and specifically not a property management company. It owned 50 properties that it acquired through "equity purchase contracts, subject to short sale."

### C. <u>The Commingling of Debtor's and Defendants' Books and Records</u>

On March 14, 2012, the Court entered an order converting this case to one under Chapter 7, and a Trustee was appointed to serve as the interim Chapter 7 trustee. On March 22, 2012, at 9:00 a.m., the Trustee personally appeared at the primary business address of the Debtor as listed on the Debtor's voluntary petition to inspect the premises and to conduct a preliminary investigation of the Debtor's on-site books and records. The signage at the business location identified "OMS LLC" as the principal occupant. The Trustee was denied access to the business location by Ronald Tym ("Tym") (Debtor's Counsel), who stated that he could not reach Goeku, and therefore, Tym was not authorized to permit the Trustee entrance to the Business Location. Further, Tym stated that the Business Location was no longer the principal place of business of the Debtor, and none of the Debtor's books, records and/or computers were located there. Later that day, the Debtor agreed to provide its books and records to the Trustee by March 27, 2012. That production never occurred. On March 29, 2012, the Trustee filed an emergency motion for issuance of a temporary restraining order and preliminary injunction enjoining the Debtor, its principals, agents and attorneys from taking any action with respect to the Debtor's books and records, and further, for an order compelling Debtor to comply with the Trustee and to turn over property of the Debtor (the "First TRO Motion").  On March 30, 2012, the Court entered an Order granting the First TRO Motion.

On April 18, 2012, the Court issued its Order On Access to Debtor's Books and Records (the "Record Preservation Order") requiring the Debtor to maintain its hard copy and digital books and records at the OMS Building in their current condition and further ordered that the Debtor shall not alter or destroy the records and requiring the Debtor to provide access to review and copy the Debtor's hard copy and digital records. On April 25, 2012, the Trustee's professionals attempted to gain access to the Debtor's books and records but were again denied access by Goeku and Dorothy claiming that multiple businesses were conducted out of the OMS Building and their investigation would be disruptive.[5]  On December 13, 2012, the Trustee was provided access to a copy of the OMS Building server. None of the required accounting records were on the server nor has the Debtor maintained a copy of such information in violation of the Court's Order. None of these facts were disputed in Defendant's response to the Motion.

The Debtor failed to preserve and turnover its records as ordered by the Court. As of June 2013, a full 18 months after the bankruptcy was filed, the Trustee had still not obtained a full copy of the Debtor's books and records or the original records, and it is unlikely that adequate funds exist to seek or enforce contempt orders or employ forensic and investigative assistance. Although OMS, LLC contends it produced a copy of the OMS Building server to the Trustee, the evidence demonstrates that this copy did not contain any relevant records regarding the Debtor's business or finances. The Trustee did not find any documents maintained in the OMS Building server to evidence the Debtor's financial transactions. The Debtor has repeatedly admitted that OMS, LLC and Dorothy have control of the Debtor's records which the Trustee has been attempting to obtain since he was appointed. This case has been pending for over three years, and the Debtor's inability to turn over estate property to the Trustee due to Dorothy and OMS, LLC's undisputed control over the Debtor's books and records has never been resolved. Without adequate financial records it is extremely difficult, if not impossible, to identify and allocate Debtor's assets from Defendants.

The control of the Debtor's records and inability of the Trustee to marshal records and assets of this estate arises in large part to the control of every aspect of the Debtor's business by Defendants. The similarity in various names used by the Debtor and Defendants along with the unity of operations has interfered with the Trustee's administration of the estate and collection of estate assets.  The Trustee's efforts to collect rents from tenants placed in the Debtor's properties at the beginning of the case was thwarted by people at the "OMS office" and Tym contacting tenants and instructing them to pay rent to them instead of the Trustee.  See Declaration of Raphael Figueroa, filed as Document # 137 in this adversary in support of motion for summary judgment. Goeku has testified that the Debtor intermixed its mail with multiple of Defendants by using the same addresses including: (a) P.O. Box 3836 which belonged to Dorothy, (b) P.O. Box 3069 owned by Tom personally and (c) a P.O. Box at 9800 Topanga Canyon Boulevard, Suite D #312, Chatsworth, California 91311. According to his testimony, the Debtor only had access to these P.O. Boxes when Dorothy or Tom permitted access on a weekly basis by letting Goeku borrow their keys. Neither Goeku nor the Debtor had independent access to these P.O. Boxes without permission from Dorothy and/or Tom, nor did the Debtor retain a key to the P.O. Boxes.

Goeku has been put forth as the Debtor's principal, but it has been difficult for the Trustee to take control of the Debtor from him because of the control of the other Defendants

---

[5]  A detailed account of the Trustee's professionals attempt was provided by Linda Lee. RJN, Ex. 24 (ECF #3-24) at 358:6-359:5; Ex. 50 (ECF #3-57) at 2293-2297.

over Goeku. At his F.R.B.P 2004 examination in this case, Goeku testified about his involvement with the Debtor, beginning in 2008, its employees, the "OMS Building" and his relationship with Dorothy. According to Goeku, in 2008 he was a salaried employee of the Debtor hired to perform maintenance work. Simultaneously, he was "helping out" at Jane's company, Creative Group Resource. Goeku testified that he became the Debtor's owner in 2009. Goeku admitted to consulting Dorothy on a weekly basis regarding the Debtor's business. In 2010, when Goeku was deposed in relation to a lawsuit by Defendant Creative Group Resource, his testimony was completely to the contrary. See Motion for Summary Judgment at 15-16. He claimed that he was never paid by Defendant Creative Group Resource. The Debtor occupied Unit A of the "OMS Building," Defendant Creative Group Resource was in Unit B and Power Dot Realty operated in Unit C. Shortly after the Debtor filed its bankruptcy petition, Defendant OMS Global started working out of the Debtor's office in Unit A.

### D.  The Entanglement of Defendants' and Debtor's Finances

While Defendants argue that they are separate entities who can untangle any commingled accounts and affairs, they do not dispute Debtor's prior statements made under penalty of perjury showing how commingled their affairs are. On January 9, 2012, the Debtor filed its petition. The Debtor's initial Schedule B disclosed just one bank account with $32,000. Its original Statement of Financial Affairs ("SOFA") disclosed that Tom and Jamie were the Debtor's former managers whose management of the Debtor terminated on December 31, 2011. The Debtor claimed its 2010 and 2011 income to have been $100,000 and $260,000, respectively.

On April 17, 2012, the Debtor filed its first monthly operating report (the "1st MOR") in which it identified six bank accounts. The initial bank statement in the 1st MOR showed eighteen mortgage payments being made. There was over $230,000 in deposits with no information regarding the source of funds. The 1st MOR also showed transfers into the Debtor's disclosed bank accounts from bank accounts that were held in the Debtor's name but had not been disclosed. Additionally, the 1st MOR included three withdrawals totaling $190,000 from local branch banks. Over $180,000 in checks were written from the Debtor's bank account with no explanation. The 1st MOR and the Debtor's bank account records also show a significant amount of pre-petition and post-petition transfers among the Debtor's disclosed bank accounts. The Debtor's balance sheet showed a personal loan from Tom for over $180,000. In addition to Debtor's bank statements, in its 1st MOR, the Debtor included six pages of OMS Global transactions which were made from the Debtor's accounts. The transactions attributed to OMS Global included the same expenses routinely paid by the Debtor: pre-petition utilities on the OMS Building; salaries for the Debtor's employees including Tym, Goeku and Jamie, among others; legal expenses; insurance costs; HOA dues and Tom's Porsche automobile payment. The Debtor expressly admitted that its "[a]ccounts were used for multiple business (sic) as bill pay accts (sic) and rent collection accts (sic)."

On May 1, 2012, the Debtor filed its second monthly operating report (the "2nd MOR") disclosing two new additional bank accounts in the name of OMS, LLC, making a total of eight disclosed accounts. Just as in the 1st MOR, there were unexplained transfers among the Debtor's bank accounts in the 2nd MOR. Similarly, the 2nd MOR showed that Tom's personal expenses were paid through Debtor's accounts. The 2nd MOR also demonstrated the following: (a) unidentified payments to Defendants Wholesale Auto Trim and Creative Group Resource, LLC, (b) almost $150,000 in checks written with no explanation, (c) almost $325,000 of deposits with no identified source, (d) a $184,700.22 loan from Tom and (e) an express admission to

commingling the Debtor's finances with related entities. The same types of transactions were specifically identified for OMS Global as in the 1st MOR. Additionally, there was a $1,008.36 payment for Mayumi Matsuba (one of Dorothy's aliases) and mortgage payments made on behalf of "J Matsuba".

On May 7, 2012, the Debtor filed an amended Statement of Financial Affairs (the "Amended SOFA") in which it disclosed $1.8 million in income for each year 2010 and 2011 (as compared to the $100,000 and $260,000 initially disclosed). Within 90 days preceding this bankruptcy, the Debtor paid Jamie and Jane's salaries and paid for Dorothy's real estate license fees. The Debtor identified Goeku and Jamie as insiders. Debtor did not disclose Tom and Jamie as former managers as it had in its original SOFA.

On May 23, 2012, the Debtor filed its amended Schedule B which only disclosed four bank accounts containing over $250,000 when previously it had disclosed eight in its 2nd MOR. Neither Debtor nor Defendants have explained this change and filed nothing to explain why Defendants were using Debtor's bank accounts.

On July 24, 2012, attorney Tym filed proofs of claim for Defendants OMS Global, LLC, Ramsfire Equity Partners, Inc., Westside Servicing Company and CD-04, Inc., all of which were for claims based on promissory notes for money lent to the Debtor at 15% interest, secured by various real properties pursuant to short form deeds of trust and assignments of rent with secured positions through "Estimated Value of First Lien on Rent." These claims totaled over $20 million and involved 165 properties. The supporting documents to these claims reflect loans made only to other insiders and/or affiliated companies. Tym also filed Tom's proof of claim for $119,022.00 asserting a loan to the Debtor on an unsecured basis, even though Tom testified before this Court that he never loaned money to the Debtor but only invested in properties. Subsequently, these proofs of claims were conditionally withdrawn.

At a continued first meeting of creditors in May 2012, Goeku testified that the Debtor transferred over $100,000 to Defendant OMS Global around the time of filing its bankruptcy petition. Goeku also testified that Dorothy was Debtor's landlord for the OMS Building.

On May 29, 2012, this Court conducted an evidentiary hearing on the Debtor's motion to reconvert to chapter 11 or dismiss its case. Forensic accountant Linda Lee testified on behalf of the Trustee that the Debtor deleted over $1.5 million in transactions from its Quickbooks records prior to delivering the record to her. The Debtor offered testimony of its accountant, Bryan Avaylon, who was hired to prepare the 1st and 2nd MORs. During this process, he met with the Debtor's bookkeeper, Al Faigel. Avaylon testified that the reason the Debtor's QuickBooks records were altered was to try to separate out the Debtor's expenses from "everything else." Avaylon admitted that "regardless of source, [monies] would be deposited into one or more bank accounts and expenses would be paid, regardless of which entity it was for, from those accounts." Avaylon testified that he had to rely on representations by Al Faigel just to identify the Debtor's assets because Debtor does not have financial statements. According to Avaylon's testimony, the Bill Pay Services bank account was for "all intents and purposes used for any and all disbursements" for the Debtor and other companies. These companies included Defendant OMS Global, among others. Avaylon also testified that the Debtor had multiple "bill pay" accounts through which debts were paid for "all different entities" and that the Debtor's income/deposits were commingled with those of other entities in multiple bank accounts.

1

2     At this hearing, Goeku testified that the Debtor's records were grouped together with
3  records of non-debtor entities and that the Debtor shared its server with all of the non-debtor
   entities in the OMS Building, in other words with Defendants. When asked about the Debtor's
4  cash management system, Goeku testified that Dorothy signed checks on the Debtor's behalf and
   that Dorothy had the ultimate say on any payment made by the Debtor, despite the fact that
5  Goeku was the sole "principal." Dorothy was compensated by the Debtor for "money [that]
   comes out of her pocket", according to Goeku.
6
7     In August and September 2012, Goeku provided deposition testimony related to the
   Debtor's second motion to dismiss this bankruptcy case. According to Goeku, the Debtor's
8  financial records were commingled with those of other entities including OMS Global and
   another entity controlled by Tom. Goeku was unclear as to exactly how Debtor's financial
9  records were maintained or where the financial records were kept. He vaguely referenced Al
   Faigel's laptop, a desktop computer in the Debtor's office at the OMS Building, the Debtor's
10 Microsoft Outlook program and "the server".

11    Goeku testified that the Debtor operates and funds its litigation by using the Debtor's
12 rental proceeds, plus Defendants Dorothy, Tom and Jamie's personal funds, plus borrowing
   funds from the Defendant entities. Goeku estimated that the Debtor borrowed anywhere from a
13 few thousand to about $30,000 per month based on the Debtor's expenses. To facilitate the loans,
   Goeku said he would call Dorothy, Tom and Jamie every month to every six weeks, on average,
14 asking for money because the rental proceeds from the Debtor's properties was insufficient to
   cover its operating expenses. Goeku claimed that Dorothy, Tom and Jamie had a working
15 understanding of how money would come into and out of the Debtor's bank accounts.

16    According to Goeku, there was no paperwork documenting the money borrowed from
17 Defendants although the recorded Deeds of Trust reference a "note" for each transaction.
   Dorothy would decide to which account the money would be transferred. Goeku had no
18 decision-making authority. Dorothy would transfer the funds to the Debtor electronically. Goeku,
   Debtor's Principal/Manager, had no knowledge regarding to which bank account(s) Dorothy
19 would transfer the money. Goeku was unable to estimate how much the Debtor borrowed from
   Dorothy on a monthly or bi-monthly basis nor could Goeku provide an estimate of how much the
20 Debtor borrowed in total for the year 2009 for business operations, even when asked about
   figures ranging from $100,000 to several million dollars. Subsequently, Goeku estimated that in
21 2009 the Debtor borrowed between $500,000 and $2 million from Dorothy and Tom individually
22 on an unsecured basis. After being asked about the $20 million in proofs of claim filed by certain
   of Defendants, Goeku then testified that the Debtor borrowed over $20 million from 2009
23 through 2011 from Defendants. Goeku testified that the $20 million was used by Debtor to
   purchase junior trust deeds encumbering the Debtor's properties, make HOA back payments,
24 property repair and maintenance, insurance, legal costs, payroll and the Debtor's general
25 business overhead.

26    Despite being the Debtor's principal/manager, Goeku had no knowledge as to how
27 money was specifically spent or which bank accounts any money was deposited in, the medium
   for transfer of the money, and no certainty that the Debtor actually received these purported
28 "loaned funds." In addition to commingling the Debtor's records, Goeku admitted that the
   Debtor's bank accounts were used to pay the debts of other people and entities "as a favor'"
   among Defendants. When asked how many bank accounts the Debtor had, Goeku responded, "I

was aware of three." Goeku did not know at which banking institution(s) the Debtor's three bank accounts were maintained. According to Goeku, the three accounts were used for payroll expenses, security deposits and general expenses. Goeku acknowledged that either Al Faigel or Dorothy signed the checks, although neither is an officer or principal of the Debtor.

### E. **The Entangled Property Transfers**

The evidence of property transfers between Defendants further complicates any hope of accurate identification and allocation of assets. The undisputed record points to over seven hundred transfers of real property starting as early as 2003 among the Debtor and Defendants to strip available equity from the properties through loans from non-insider lenders. See Second RJN Ex.160, Declaration of Karen Lasik Regional Manager of Library & Research Services in the law firm Bryan Cave LLP, counsel for Plaintiff Bank of America, N.A.[6] Plaintiff's evidence based on only public records provides representative examples of five different properties that illustrate the numerous transfers between Defendants. See RJN Ex. 51-128. As discussed above, in each example, the public records indicate title is transferred from an individual to one of the Defendants such as Creative Group Resource. Deeds of Trust are then recorded in favor of one of the Defendants. Once the Individual Defendant obtained title, he or she would encumber the property with additional loans, typically from a traditional lending institution, and Deeds of Trust and then transfer the property again to a different Defendant or to a newly formed trust. See supra Sect. III. A, p. 11-12.

The extreme and creative property transfer system utilized by Defendants is evident throughout the exhibits. Plaintiff walked the Court through an example of how the properties regularly change hands. Plaintiff referenced Request for Judicial Notice exhibits 56-71, which are a series of public documents related to one property demonstrating the transfers between Defendants and others from 2001 to 2012. All of the transfers were recorded with the Los Angeles County Recorder's Office regarding 20340 Marilla St., Chatsworth, CA 91311, property lot 56 of tract 23471. This example highlights the way that the same property was used repeated times between Defendants.

On August 29, 2001, there was a Grant Deed transfer from the original homeowners to Defendant Creative Group Resource. See RJN Ex 56. On January 25, 2002, Creative Group Resource (Defendant) transferred the property to Tom (Defendant) by Corporation Grant Deed. See RJN Ex. 57. On June 23, 2003, there was a Grant Deed from Tom to Jane (not a Defendant but an insider). See RJN Ex. 58. On May 19, 2004, there was a short form Deed of Trust and Assignment of Rents from Jane to Boston Holding Company as beneficiary See RJN Ex. 59 (linking Debtor to this property). On September 30, 2004, there was a Grant Deed transfer of the property from Jane to Yun Matsuba (aka Dorothy). See Ex. 60. On October 25, 2005, there was a Deed of Trust recorded showing the property was used to obtain a loan from a traditional lender in the amount of $332,000. The Borrower was Yun Matsuba. See RJN Ex. 61 bate stamp 2359.

---

[6] Her Declaration states, "I performed research to determine if OMS, LLC, Dorothy Matsuba, Mayumi Matsuba, Yun Matsuba, Thomas Matsuba, Jamie Matsuba, Jane Matsuba, Ryu Goeku, Masae Matsuba, Masae Ishida, Creative Group Resource, LLC, Ramsfire Equity Partners, Inc., Ramsfire Global, LLC, Westside Servicing Company, and Trust Holding Service Co. are the current title owners of record of any real property. Each of these names were entered into the Lexis Nexis Real Property Public Records database. I then reviewed the search results, which identified that these individuals and entities were involved in over 700 separate transactions pertaining to hundreds of properties. These transactions involved either the transfer of property interests or the creation of liens on parcels of property." ECF #4; Second RJN, Ex. 160 at 5734-5857.

On February 1, 2006, Washington Mutual recorded an Equity Deed of Trust in the amount of $199,000. See RJN Ex. 62. On February 17, 2006, a Deed of Trust with assignment of rents was recorded from Yun Matsuba to Westside Service Co. (Defendant). See RJN Ex. 63. On February 6, 2007, a Grant Deed transfer was recorded from Yun Matsuba to Creative Group Resources. See RJN Ex. 64. On April 16, 2009, a Notice of Default was recorded by secured lender exercising its default rights. See RJN Ex. 65. On May 6, 2010, a short form DOT and assignment of rents from Creative Group Resource to Boston Holding Company (dba of debtor) as Trustee and Ramsfire Global LLC (now OMS Global) was recorded. See RJN Ex. 66. A Notice of Trustee Sale was recorded on May 18, 2010. See RJN Ex. 67. On May 18, 2010, a Substitution of Trustee and Assignment of Deed of Trust from Lender was recorded. See RJN Ex. 68. On May 19, 2011, another Notice of Trustee Sale was recorded. See RJN Ex. 69. On March 2, 2012, a Grant Deed from Creative Group Resources to Marilla Trust and Trust Holding Service Co. (dba of Debtor) as Trustee was recorded. This transfer was a post- petition receipt of property to the Debtor as trustee when Debtor was still in a chapter 11. See RJN Ex. 70. Another Notice of Trustee Sale recorded on March 20, 2012. See RJN Ex. 71.

This evidence demonstrates how complicated and time consuming it will be to untangle and allocate the Debtor's assets from Defendants assets, if that is even possible. In addition, this evidence only accounts for tracing on a property by property basis, and there is no evidence that tracing title can be attributed to an entity. Even if someone had a snapshot of a property today, that person would not be able to tell if any income were attributable to a property, or whether the rent belongs to the title owner or another entity, or if the title owner serviced the loan. There is no information on this type of tracing even though Defendants claim it exists. Even Defendants don't know who owns particular assets. At least three of Defendants, including OMS Global, Westside Servicing and Jamie, have commenced litigation over real property initially identified as the Debtor's property on its bankruptcy schedules.

The Individual Defendants have attached lists of the properties they own separately as exhibits to each of their declarations. While their statements that they believe they own the properties separately from the Debtor are taken as true at this stage, the declarations provide no explanation of how they acquired the properties, who is entitled to the rents or loan payments from the properties and whether these properties' finances are part of the commingled bank accounts discussed earlier.

Dorothy lists three real properties which she states she owns or which are held in trust for her. One of those properties is 20632 Lemarsh St. in Chatsworth, California. In her earlier disclosures, she listed Tom as the owner of that property. Similarly, in his declaration in opposition to the motion, Tom lists fifteen real properties that he owns or which are held in trust for him. In his discovery responses, he listed solely eight properties. Jaimie has filed a declaration stating that she owns seven real properties, but she provided only five real properties in her discovery responses. Even if all Defendants' statements are taken as true, the Trustee would not know which one he could rely on.

## F.  Time and Expense to Unscramble Debtor and Defendants

It is difficult to determine which entity holds what interest and who is entitled to collect what. Plaintiff submitted several charts highlighting the entanglement of the Debtor's affairs with Defendants. See Motion Ex. A-D including exhibits submitted as supporting evidence; see also Reply Ex. D Amended Defendants Property Disclosures. The demonstrative chart attached

-23-

as exhibit A to this memorandum of decision, emphasizes the interrelatedness between Defendants. The chart, as well as the undisputed evidence underlying the graphical depiction demonstrates the complete overlap and inter-connection among Defendants and an undisputed tangled web of confusing relationships and control.

Defendants' declarations saying that it is possible to trace the assets are not sufficient to raise a genuine issue of material fact. They provide solely conclusory assertions and a hopeful opinion by a forensic accountant that it could theoretically be done. They do not address whether it can be done on an entity by entity basis. The Trustee's professional, Linda Lee, filed a declaration stating that is would cost tens of thousands of dollars to just attempt to unscramble the assets and transactions. Defendants claim that they will pay the expenses necessary to unscramble its assets from the Debtor, but again, no evidence of whether this is even possible has been submitted and the cost of trying to do so has not been actually provided to the Trustee. The Trustee has been trying to sort out the records and assets of the Debtor since he was appointed in 2012 and repeatedly sought Defendants' assistance simply to obtain records. Thus, it is undisputed that substantial estate resources will be required to attempt to untangle Defendants' assets and liabilities, if at all possible. As the business model appears to have been designed to confuse homeowners, lenders and courts, any reconstruction is likely to be arbitrary and fictional as well.

The Grobstein Declaration was vague and incomplete, relying heavily on hypothetical language. Statements such as: "If the information can be reconstructed on a property by property basis, and the properties can be attributed to specific entities…" and "assuming all entries in Quickbooks contains this level of detail…," indicate he does not know exactly how well he could reconstruct the records. Grobstein's opinion was limited to transactions in the general ledger and bank records and whether those can be segregated by entity.  The records that were provided to Grobstein are from a very limited time period: August 2009 through May 2010 and June 2010 through March 2011.  Grobstein claims to have reviewed statements for 2011 and a Quickbooks general ledger where HOA dues were recorded so he was able to identify the property, but Grobstein did not attach any reports or provide copies of what he looked at or what his reconstruction looked like. The Defendants' declarations attached some records but it is unclear whether they are the same as were provided to Grobstein or whether the documents contain the entire universe of records available. Grobstein also mentions the limitations with "handwritten checks that are illegible, and cashier's checks that do not provide a name of originator." Grobstein states there is no detail for the checks other than the amount, date and check number but he believes he can reconstruct the details regarding the disbursements. The Grobstein Declaration confirms that Defendants accounts were not maintained in a separate way ever and any reconstruction will be lengthy and difficult even for a limited time period.

Grobstein does not seem to have been provided with the Motion for Summary Judgment and supporting documents. He did not comment on the report of Linda Lee explaining that $1.5 million in transactions were deleted from the records before they were delivered to the Trustee, so he does not explain how this could properly be reconstructed or even considered reliable. Grobstein fails to discuss the various property transfers between Defendants and Debtor and does not address whether the properties can be attributed to a particular entity or individual. Even though the limited deposit slips provided sometimes indicate the name of the property, there is no tie in to who owned or controlled the property, what litigation is going on, who resides in it, etc. Grobstein refers to disbursement results and believes they can "identify the purpose of the transaction and which entity the expense related to." But Grobstein does not state for which time

period or which properties, or which of the many entities owned the property at the time.

Finally, Grobstein fails to mention how long and what cost this reconstruction would take. Grobstein generalized that it could, in theory, be done. Grobstein, however, needed text recognition software to search for check numbers on bank statements to correlate to a check stub and whatever other information they had, such as an invoice. Using the 2012 filing date and going back 6 years for a fraudulent transfer analysis, this would need to be done for every check for 6 years. The Trustee's professional fees are already quite high. There have been 1200 docket entries in the bankruptcy case, 40 adversary proceedings filed and hundreds of hearings held since this case was filed. The effort it has taken simply to marshal the assets and liabilities so far has been herculean. The Court is aware of Grobstein's work in other cases and recognizes his skill, and even he could not conclusively say the tracing and transactions could be reconstructed and, if so, what that would cost. Grobstein does not raise an issue of material fact preventing substantive consolidation. His hypothetical and limited observations are simply insufficient, even given all reasonable inferences in Defendants' favor to ignore the overwhelming evidence of the purposeful entanglement of Defendants and Debtors assets and business functions.

The Grobstein Declaration is also based on the assumption that he can rely on the assistance of Defendants and, subsequently, the Trustee and creditors can rely on whatever tracing he provides. He offers the tracing he hopes to do someday with no reference or apparent review of previous testimony in the bankruptcy case about the accounts he hopes to review. Goeku testified that Al Faigel had multiple businesses' financial records mixed with the Debtor's and that the Debtor has no record of the money it has borrowed from Dorothy, Tom, Jamie and their entities. Debtor's pleadings and testimony throughout the bankruptcy case have disclosed different bank accounts, and Grobstein does not seem to have been provided records or access to those accounts. None of Defendants' declarations provide any testimony as to which bank accounts belong to the Debtor and which ones belong to Defendants. They also do not even comment on the MORs filed early in the case showing hundreds of thousands of dollars being withdrawn, deposited and transferred that seem to contradict the analysis Grobstein hopes to perform showing a clear delineation of different entities.

As to the second <u>Bonham</u> factor, Plaintiff has provided sufficient evidence to demonstrate commingling of assets and business functions between Debtor and Defendants and establish that the affairs of Defendants were entangled with each other. Despite Defendants assertions to the contrary, their entanglement with the Debtor was pervasive. Because the assets of the Debtor are not traceable and identifiable, it is sufficient to satisfy the second requirement of substantive consolidation under the entanglement prong.

### G. Benefit of Creditors

According to the <u>Bonham</u> test, the Court must determine whether substantive consolidation benefits all creditors. The requirement to "benefit all creditors" does not mean each and every creditor but rather the creditor body as a whole. <u>In re Stayton SW Assisted Living, L.L.C.,</u> 2009 U.S. Dist. LEXIS 119186, at *12 (D. Or. Dec. 22, 2009). Substantive consolidation of the Debtor and Defendants is necessary to avoid inequitable diminution of the Debtor's estate and to protect the Debtor's creditors.

In connection with this adversary proceeding, Defendants produced responses to Plaintiff's discovery requests. Defendants' answers to interrogatories revealed the following: (1)

Defendants OMS Global, Westside Servicing, Dorothy, Tom and Jamie purport to serve as trustee for multiple real property trusts and (2) Defendants OMS Global, Ramsfire Equity Partners, CD-04, Westside Servicing and the Debtor hold junior liens on these real properties allegedly held in trust. The estate's assets will increase creating a larger pool of assets to distribute to creditors. OMS Global is the title owner or manager of 32 real properties of which 11 properties generate approximately $21,850 per month in rental income. The estate's assets may be increased by additional properties that were abandoned by the Trustee in the bankruptcy case but now generate rental income according to OMS Global. The Defendants disclose a title, trustee and/or management interest in 53 properties that were previously property of the estate, but abandoned by the Trustee. Of the 53 properties, Defendants claim 24 of these properties produce rent at approximately $51,300 per month.  The Trustee will need to evaluate what the basis of ownership is for these properties and whether they should continue to be leased out.

New creditors may dilute the asset pool, but they won't dilute the existing creditors' allocation of assets. Defendants' own undisputed evidence of few additional creditors confirms that substantive consolidation will benefit the estate without any substantial burden. Defendants, in connection with this adversary proceeding produced responses to Plaintiff's discovery requests stating that there are no additional creditors. The Entity Defendants asserted that they have no secured or unsecured debt – i.e. they do not have any creditors. Dorothy stated that she has no unsecured creditors but listed Verizon Wireless in her declaration submitted with the opposition. Although, Tom and Jamie refused to disclose their debts under the United States and California Constitutions, they provided a list of their liabilities in their declarations in support of the opposition. This list included secured and unsecured creditors. Both Defendants list minimal unsecured creditors and the secured creditors are protected by the properties they own. The Defendants' evidence establishes that the unsecured creditor pool will increase at most by $60,000. The increase in additional assets will compensate for the slight addition to the creditor claims. The percentage allocated to the current creditor pool may also increase if Defendants' claims in the total amount of $8,076,372 are eliminated. Therefore, the asset pool may potentially increase significantly depending on what the Trustee seeks to pursue under his business judgment, and the creditor pool will not be significantly impacted.

The estate's creditors will benefit because OMS Global will no longer control litigation seeking to further the same fraudulent business model of the Debtor. Substantive consolidation would also reduce the likelihood of further frivolous litigation asserted against other lenders and servicers. The Court has addressed nearly eighty relief from stay motions in this case to date. This benefits creditors and also reduces the burden placed on the courts to expend precious judicial resources addressing frivolous, repetitive claims. Because foreclosure actions are unnecessarily delayed, the trustee or lenders can stop advancing money for insurance and property taxes.

Another creditor, Nationstar, who was granted its request to intervene in this adversary, filed a joinder to the motion for summary judgment. At the hearing, Nationstar appeared and argued that substantive consolidation would benefit not just Plaintiff Bank of America but it benefits all lenders and stops piecemeal litigation, helping all creditors involved. No creditor other than insider Defendants involved in this operation oppose the substantive consolidation motion.

It is unknown whether substantive consolidation will assist the hundreds of homeowners who were the original borrowers for the properties before they came into contact with the Debtor

and Defendants. They have sporadically appeared and provided information throughout this bankruptcy case and the previous related cases. Because of the multiple layers of trusts and transfers designed by Defendants, they have not been noticed or considered creditors of any of these bankruptcy cases. Some of them appeared to believe Defendants are still assisting them. Some may have no idea that they may still be liable on the loans they took out despite the subsequent trust deed transfers. It is unknown whether many of them could have obtained legitimate loan modifications or short sales had they not first signed up for Debtor's "Trust Holding Service." Their victimization by or cooperation in this operation is not addressed here because the original borrowers have not been found to be creditors of the estate.

## H.  Balance of the Benefits and Harm

Substantive consolidation will not be a burden to the estate because the Trustee is already familiar with eighty three of the ninety six parcels of real property that may come into the estate. The Trustee can determine whether those properties should be quickly abandoned or administered. The Trustee already abandoned fifty three properties that had been in the Debtor's bankruptcy case and thirty properties are currently administered by the Trustee. According to Defendants' disclosures, there are thirteen new properties that need to be analyzed. In addition, substantive consolidation will render moot multiple pending adversary proceedings regarding Debtor's fraudulent transfers to Defendants, preserving estate assets. Finally, if the Trustee needs to address all of the removed state court pleadings without having any authority over the other entities, it will run up administrative expenses dealing with the litigation strategy developed by Defendants to delay foreclosure.

No one has identified any harm to balance against the many benefits of consolidation. Independently, the Court has inquired how individuals who have not filed for bankruptcy should be handled here. There appears to be ample precedent for substantively consolidating an artificial entity into another entity's or into an individual's bankruptcy case, but very little case law consolidating a non-debtor individual into an entity's bankruptcy case. See e.g., In re Point Center Financial, Inc., Case No. 8:13-11495 (Bankr. C.D Cal., June 30, 2014). The concept is, however, the same where the facts warrant substantive consolidation. See e.g. In re Creditors Serv. Corp., 195 B.R. 680, 692 (Bankr. S.D. Ohio 1996) ;[7] see also In re Lahijani, No. SV 02-01797 GM, 2005 WL 4658490 (Bankr. C.D. Cal. Oct. 3, 2005). Based on the evidence presented, all Individual Defendants must be included with the substantive consolidation. The egregious facts of this case present one of those rare cases where substantive consolidation of non-filing individuals is also warranted.

The Court finds it is necessary to include the Individual Defendants because further harm to the estate will result absent substantive consolidation. The Individual Defendants are the ring masters behind the labyrinthine system of transactions and transfers of properties that can only be untangled if the individuals use of accounts and property transfers are included. Each of the

---

[7]  The bankruptcy court ordered substantive consolidation of a corporate Chapter 7 debtor with non-debtor entities operating out of same building and with the individual who owned all of debtor's stock, subject to certain restrictions. In re Creditors Serv. Corp., 195 B.R. 680 (Bankr. S.D. Ohio 1996). The Court found substantive consolidation was appropriate given the extent of entanglement between the various entities, whose resources were freely used to satisfy each other's needs without regard to their separate identities, the evidence that this close relationship had been used to fraudulently conceal debtor's post-petition business transactions, the lack of any creditor opposition to consolidation, and the because the bankruptcy court's ability to lessen the impact of substantive consolidation by imposing restrictions. Id.

individual Defendants played a significant role in operating the joint scheme. If the Individual Defendants are excluded, the Trustee will not be able to marshal the assets due to the numerous transfers between the individuals and the entities. If excluded, Tom, Jaime, and Dorothy can continue to form new entities and move Debtor's remaining properties around in a way that harms the Debtor and interferes with the Trustee's administration of the assets. The Individual Defendants would be free to continue to use the same business tactics to victimize borrowers at the expense of lenders. Substantive consolidation will eliminate these types of tactics in the future.

In addition, the Individual Defendants were entangled in the financial affairs of the Debtor. Tom, Dorothy, and Jamie are the "investors" who contributed funds monthly to support the Debtor's general operations including making payroll and funding litigation expenses. There are no records of the amount of funds that were deposited or withdrawn and no one provided any loan documents that detail the terms for these transactions; i.e., rate of interest, length of the loan and payment amounts. Tom, Dorothy, and Jamie had a working understanding of how many transfers or transactions would come in and out of the Debtor. They also need to be included given their involvement in Debtor's post-petition business transactions. Plaintiff provided evidence that the Individual Defendants control the Debtor's business and finances, including P.O. Boxes for the Debtor that is exclusively controlled by Dorothy and Tom.

Finally, the Individual Defendants have showed minimal separate financial affairs other than the Defendant entities, so there is little risk of affecting their separate finances. In balancing potential benefits and harm, the Court may utilize its equitable powers to diminish any unnecessary harm to the Individual Defendants, if necessary.

IV.    CONCLUSION

In summary, the financial affairs of the entities and individual defendants are so entangled that they constitute a single enterprise. While some of the entities are separate on paper, in practice they are treated as one enterprise by their principals, Jamie and Tom with assistance from Dorothy. The needs of all Defendants are satisfied from available resources, and the entities are used to pay expenses without regard to their separate identity. Contrary to Defendants' assertions, the relationship is much closer than the mere sharing of the billpay account. The Court finds that substantive consolidation of all Defendants is proper. The Motion for Summary Judgment is granted.

The Ninth Circuit in Bonham ratified *nunc pro tunc* consolidation. The Ninth Circuit has left it up to the discretion of the bankruptcy court to determine whether *nunc pro tunc* consolidation is appropriate in each case without having to apply a specific test. In re Lahijani, No. SV 02-01797 GM, 2005 WL 4658490, at *11 (Bankr. C.D. Cal. Oct. 3, 2005) (we leave it to the discretion of the bankruptcy court to determine in light of the equitable nature of substantive consolidation whether *nunc pro tunc* consolidation should be ordered. Bonham, at 771). The Trustee could arguably recover transfers going back seven years from the petition date. In re EPD Inv. Co., LLC, 523 B.R. 680, 683 (B.A.P. 9th Cir. 2015) citing Alexander v. Compton (In re Bonham), 229 F.3d 750, 771 (9th Cir.2000) (when court orders substantive consolidation *nunc pro tunc*, the filing date of the original bankruptcy petition is the controlling date from which to measure the limitations period for trustee's avoidance actions). All Defendants are substantively consolidated *nunc pro tunc* to January 9, 2012, the date Debtor filed bankruptcy. The Individual Defendants objection to discharge considerations under 11 U.S.C. §§ 523 and 727 is still subject

to further briefing if necessary and not specifically ordered *nunc pro tunc* at this time.

Although including the Individual Defendants is necessary, there may be conditions that will need to be determined in the course of the case. Equitable principles allow substantive consolidation with appropriate conditions.  Creditors of individual debtors need a deadline to object to discharge. Obviously, that cannot be a date that passed years ago at the initiation of Debtor's bankruptcy.  Whether actions attributed to them for objections to discharge can date back to Debtor's original filing still needs to be determined if necessary. The Court is considering limiting any § 727 actions based solely on activity after entry of a substantive consolidation order. As the Individual Defendants, creditors and the Trustee may want to be heard on what an appropriate deadline should be for objections to discharge, what type of order for relief should be set under Federal Rule of Bankruptcy 2002(o), and any other notice or deadlines to be set. The Trustee may also want to comment on whether any avoiding powers or other rights or deadlines should be addressed as part of a subsequent order as to the nature of the substantive consolidation's *nunc pro tunc* application. All parties should brief these administrative questions by May 22, 2015, if they want to be heard. All Defendants are ordered to file their schedules within 30 days of entry of Plaintiff's order.

The Court reserves the right to impose limitations and restrictions on this substantive consolidation as needed and will address any issues that present themselves after the substantive consolidation order has been entered. Further discussion of issues raised by the consolidation will be discussed at the next status conference on May 27, 2015 at 2:00 p.m. Plaintiff should submit a judgment and order in accordance with this ruling.

###

Date: April 29, 2015

Maureen A. Tighe
United States Bankruptcy Judge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A



DEFENDANT AND RELATED PERSONS INTERRELATIONSHIPS[a]

\* This chart is provided for demonstrative purposes only and not as evidence.  See attached "Key" for corresponding exhibits attached to Plaintiff's Request for Judicial Notice in Support of Plaintiff's Application for Order to Show Cause re Preliminary Injunction (the "Application"), as well as paragraph references to Plaintiff's Complaint for Substantive Consolidation (the "Complaint"), both of which are filed concurrently herewith.  This chart may not include all evidence or arguments supporting the Application or the Complaint.  Plaintiff's investigation is ongoing.

## NUMERIC CHART: KEY TO "DEFENDANT AND RELATED PERSONS INTERRELATIONSHIPS"

| LINE NO. | RELATIONSHIP | EVIDENCE | COMPLAINT PARAGRAPHS |
|---|---|---|---|
| 1 | Dorothy Matsuba to Debtor Owner Management Service, LLC | RJN Exh. 20 at pg. 142; RJN Exh. 21 at pg. 224; RJN Exh. 24 at pgs. 472-473 and 485; RJN Exh. 29 at pg. 714, lines 13-18, pg. 717, lines 11-20, pg. 805 line 7 through pg. 810 line 20, pg. 825 lines 16-19, pg. 949 line 13 through pg. 951 line 25, pg. 1000 line 5 through pg. 1005 line 7, pg. 1023 line 5 through pg. 1028 line 24, pg. 1030, line 19 through p. 1031, line 5; RJN Exh. 41 at pg 2037 line 20 through pg. 2041 line 13; RJN Exh. 43 at pg. 2052 lines 17-26, pgs. 2054 - 2055; RJN Exh. 44 at pg. 2146, 2149-2150,  2152; RJN Exh. 46 at pg. 2201; RJN Exh. 54; RJN Exh. 55 | 6, 32-34, 38, 41-43, 45-47, 96-99 |
| 2 | Dorothy Matsuba to OMS, LLC | RJN Exh. 29 at pg. 805, line 7 through p. 807, line 10; RJN Exh. 41 at pgs. 2035 and 2040 through 2041; RJN Exh. 43 at pgs. 2052 and 2054 - 2055 | 7, 34 |
| 3 | Dorothy Matsuba to OMS, Global, LLC | RJN Exh. 29 at pgs. 805 - 807;  RJN Exh. 41 at pgs. 2035 and 2040 - 2041; RJN Exh. 43 at pgs. 2052 and 2054 - 2055 | 8, 34 |
| 4 | Dorothy Matsuba to Ramsfire Global, LLC | RJN Exh. 29 at pgs. 805 - 807;  RJN Exh. 41 at pgs. 2035 and 2040 - 2041; RJN Exh. 43 at pgs. 2052 and 2054 - 2055 | 9, 34 |
| 5 | Dorothy Matsuba to Ramsfire Equity Partners, Inc. | RJN Exh. 29 at pgs. 805 - 807;  RJN Exh. 41 at pgs. 2035 and 2040 - 2041; RJN Exh. 43 at pgs. 2052 and 2054 - 2055 | 10, 34 |
| 6 | Dorothy Matsuba to Westside Servicing Co. | RJN Exh. 29 at pgs. 805 - 807 | 11, 34 |
| 7 | Dorothy Matsuba to CD-04, Inc. | RJN Exh. 29 at pgs. 805 - 807; RJN Exh. 41 at pgs. 2037 - 2038 | 12, 21, 34, 78-81 |
| 8 | Dorothy Matsuba to Creative Group Resource | RJN Exh. 40 at pgs. 1988 - 1989, pg. 1989 - 1990, pg. 1995 - 1996, pg. 2002, pg. 2012 - 2013; RJN Exh. 51; RJN Exh. 52; RJN Exh. 53 | 13, 87 |
| 9 | Tom Matsuba to Debtor Owner Management Service, LLC | RJN Exh. 6; RJN Exh. 13; RJN Exh. 15; RJN Exh. 18 at pg. 78; RJN Exh. 19 at pgs. 82, 88 and 95 - 100; RJN Exh. 20 at pgs. 142 - 143 and 151; RJN Exh. 29 at pgs. 701, lines 3-24, pg. 716, line 1 through pg. 717, line 25, page 805, line 7 through p. 809, line 25, p. 984, line 18 through p. 986, line 10 and pg. 1024, line 2 through p. 1028, line 24, and pg. 1030, line 19 through p. 1031, line 5 | 22, 28-33, 41, 43, 46, 51, 98, 105-108 |
| 10 | Tom Matsuba to Westside Servicing Co. | RJN Exh. 1; RJN Exh. 10; RJN Exh. 29 at pg 1190, lines 3-6, pg. 1195, line 21 through p. 1196, line 8; RJN Exh. 35 at pgs. 1701-1702 | 20, 69-72 |
| 11 | Tom Matsuba to OMS, LLC | RJN Exh. 2; RJN Exh. 5 | 20, 105 |
| 12 | Tom Matsuba to Ramsfire Global, LLC | RJN Exh. 3; RJN Exh. 8 | 20, 105 |
| 13 | Jamie Matsuba to Debtor Owner Management Service, LLC | RJN Exh. 6; RJN Exh. 13; RJN Exh. 15; RJN Exh. 18 at pg. 78; RJN Exh. 19 at pgs. 95-100; RJN Exh. 20 at pgs. 142, 147 and 149-150; RJN Exh. 29 at pg. 805, line 7 through p. 807, line 18 and pg. 824, lines 6-23 | 22, 28, 31-33, 41, 114-117 |
| 14 | Jamie Matsuba to Ramsfire Equity Partners, Inc. | RJN Exh. 9; RJN Exh. 29 at pg. 823, line 8 through pg. 824, line 18; RJN Exh. 33 at pgs. 1502 - 1503; RJN Exh. 38 at p. 1908 | 20, 22, 25-26, 50-53, 62,114 |
| 15 | Jamie Matsuba to Ramsfire Global, LLC | RJN Exh. 3; RJN Exh. 8; RJN Exh 28 at pgs. 676-678 and 680; RJN Exh. 29 at pg. 822, line 12 through p. 823, line 20 | 20, 22, 26, 50-53, 114 |
| 16 | Jamie Matsuba to OMS, LLC | RJN Exh. 2; RJN Exh. 5; RJN Exh. 26 at pgs. 624-633; RJN Exh. 28 at pg. 680 | 21, 23, 29, 51 - 53, 114 |
| 17 | Jamie Matsuba to OMS Global, LLC | RJN Exh. 19 at pg. 100; RJN Exh. 20 at pgs. 147 and 149-150 | 39, 50-53 |

**NUMERIC CHART: KEY TO "DEFENDANT AND RELATED PERSONS INTERRELATIONSHIPS"**

| LINE NO. | RELATIONSHIP | EVIDENCE | COMPLAINT PARAGRAPHS |
|---|---|---|---|
| 18 | OMS, LLC to Ramsfire Equity Partners, Inc. | RJN Exh. 5 | 20, 22 |
| 19 | OMS, LLC to Ramsfire Global, LLC | RJN Exh. 28 at pg. 677 | 20, 26 |
| 20 | Masae Ishida to CD-04, Inc. | RJN Exh. 5; RJN Exh. 14; RJN Exh. 29 at pg. 1131, line 21 through p. 1133, line 19, pg. 1134, lines 17-20; RJN Exh. 34 at pg. 1596 | 21, 78 |
| 21 | Debtor Owner Management Service, LLC to OMS Global, LLC | RJN Exh. 3; RJN Exh. 15; RJN Exh. 16; RJN Exh. 19 at pgs. 95-100; RJN Exh. 20 at pgs. 147-151; RJN Exh. 24 at pg. 439, lines 8-19;  RJN Exh. 29 at pgs. 812-813 and 823; RJN Exh. 32 at pgs. 1495-1500; RJN Exh. 37 at pg. 1858, lines 2-4; RJN Exh. 41 at pgs. 2034-2035 | 31, 32, 34, 37, 38, 40, 52-54 |
| 22 | Jane Garcia to Creative Group Resource | RJN Exh. 40 at pgs. 1968-1969, 1986, 1994-1996 and 2002-2003 | 87-88 |
| 23 | Debtor Owner Management Service, LLC to Creative Group Resource | RJN Exh. 19 at pg. 88; RJN Exh. 20 at pg. 143; RJN Exh. 29 at pgs. 936 and 951-952 | 30, 32, 38, 48, 87-90 |
| 24 | Debtor Owner Management Service, LLC to Ryu Goeku | RJN Exh. 16 at pg. 49; RJN Exh. 19 at pgs. 95 - 100; RJN Exh. 20 at pgs. 147 and 150; RJN Exh. 29 at pg. 700, lines 20-24, pg. 709, line 17 through pg. 713, line 6 | 17, 33, 41, 47-48 |
| 25 | Debtor Owner Management Service, LLC to OMS, LLC | RJN Exh. 1; RJN Exh. 3; RJN Exh. 20 at pg. 182; RJN Exh. 37 at pg. 1859; RJN Exh. 43 at pgs. 2052, 2054 and 2057; RJN Exh. 44 at pg. 2146, lines 4-18; RJN Exh. 46 at pg. 2201 | 24, 38, 50-52 |
| 26 | OMS Global, LLC to OMS, LLC | RJN Exh. 9; RJN Exh. 15 | 27, 38 |
| 27 | Debtor Owner Management Service, LLC to Westside Servicing Co. | RJN Exh. 1; RJN Exh. 3; RJN Exh. 29 at pgs. 805, line 7 through p. 807, line 4, pg. 812, line 18 through pg. 813, line 18; RJN 35 | 24, 39, 43, 69-72 |
| 28 | Debtor Owner Management Service, LLC to Ramsfire Global, LLC | RJN Exh. 1; RJN Exh. 3; RJN Exh. 29 at pgs. 805, line 7 through p. 807, line 4, pg. 812, line 18 through pg. 813, line 18, pg. 822, line 25 through pg. 823, line 2 | 24, 38, 43, 50-54 |
| 29 | Debtor Owner Management Service, LLC to Ramsfire Equity Partners, Inc. | RJN Exh. 1; RJN Exh. 3; RJN Exh. 29 at pgs. 805, line 7 through p. 807, line 4, pg. 812, line 18 through pg. 813, line 11; RJN Exh. 33 | 24, 38, 43, 60-62 |
| 30 | Debtor Owner Management Service, LLC to CD-04, Inc. | RJN Exh. 29 at pgs. 805, line 7 through p. 807, line 4, pg. 812, line 18 through pg. 813, line 11; RJN Exh. 34 | 38, 43, 79-81 |
| 31 | Tom Matsuba to OMS Global, LLC | RJN Exh. 19 at pg. 100 | 29-31 |
| 32 | Ryu Goeku to OMS Global, LLC | RJN Exh. 19 at pg. 99; RJN Exh. 20 at pgs. 147 and 150 | 29-31 |
| 33 | OMS, LLC and Ramsfire Global, LLC to OMS Global, LLC | RJN Exh. 26 at pg. 624; RJN Exh. 27 at pg. 667; RJN Exh. 32 at pgs. 1495-1496 | 9, 20, 22, 26, 27, 39, 50-54 |
| 34 | Ryu Goeku to Creative Group Resource | RJN Exh 40 at pgs. 1964-1965, 1967, 1981-1983 and 2006-2007 | 47-48, 87-88, 90 |

969242

2